Good afternoon, your honors. Floyd Mandel, I represent E! Entertainment Television. I'd like to reserve a few minutes, if your honors will let me, for rebuttal. Uh, we were... Let the prisoners escape. Thank you. Okay, go ahead. Excuse me, your honor. Again, thank you for having me here from Chicago, sunny California. Fortunately, I did get here on time, and I have read your honor's decisions. And I'm prepared to answer some of your honor's questions concerning the actual confusion issue you just raised in the last case. First, your honor, let me start by saying that I know... If you've read my decisions, I feel sorry for you. Well, your honor... Are you able to stay awake? Well, at least in the trademark area, your honor, it's fascinating. Your honor, we realize we have a heavy burden here. Because we have to show an abuse of discretion below. We believe we've met that burden. We believe, if your honors look at our briefs and at the record, you will see many errors of law, clearly erroneous, and an abuse of discretion by applying incorrect legal standards. Your honors, I stand here today representing a company whose most valuable asset is its name and its goodwill and its reputation. E-Entertainment and the E-Mark is among the most valuable assets of any entertainment company. Within the last year before we brought our preliminary injunction motion, $88 million was spent on advertising and publicity. The E-Name, the E-Entertainment name is viewed by millions and millions, hundreds of millions of viewers. And it is very well recognized. We have got a situation here, your honors, where a company has come in from Canada and announced on January 22nd of this year a name change. You could not come more identical to our client's marks unless you were using the identical mark. It's E-Roman, excuse me, E-Numeral One Entertainment. Ours is E-Exclamation Mark Entertainment. Our mark is E-Explanation. Theirs is E-Numeral One. Well, they just hit the shift key, that's all. Or you hit the shift key. One of you hit the shift key. Absolutely, your honors. And I'd respectfully say if your honors look, for example, at how they are depicted in print, if you look at the record at pages 191 and then at 193 and see the headline of the Variety newspaper, you're not going to be able to tell which mark is which. They are that identical. And as this court has said in the DreamWorks case, this isn't like selling clothing like the last cases, your honor, where there's labels on clothing or like the old case where people are looking at two motorcycle helmets. These are marks that consumers encounter by reading about them, watching them. And so where did the district court go wrong? Where was the error that the district court? Where, where, where, what would, you know, where did he take the merit reversal? Well, your honor, I guess first of all, I would say that we are looking at two basic claims. We're looking at the infringement claim, which requires looking at the sleek craft factors, number of factors. Some are more important than others in different cases. In your estimation, which is the most, which are the most important factors in this case? In this case, your honor, with respect to the infringement claim, the sleek craft factors, the failure to not view these marks is visually similar. In fact, you know, what was emphasized is the differences in the marks, not the similarities. The conclusion that the parties are in totally different businesses when they are in converging businesses, related businesses. And the courts basically say that overlap, but it doesn't seem to be that extensive. Your honor, it is very extensive. If you look at the application that they filed on July 23rd, and you look at the description of services for their application, you'll see that they're applying for television programming, television. Do they have television programming right now? They sell to others. They sell to HBO, to ABC, to FX. We sell DVDs. They sell DVDs. We're selling and competing for the same general audiences, your honor. The second area where I think the judge committed clear error, your honor, is the anti-dilution statute. The anti-dilution statute is meant for strong marks. I'd respectfully- Marks, as they say. Pardon me? Famous marks. Famous marks. Household name marks, your honor. And I'd respectfully say that if e-entertainment, which goes into 186 million households, unique viewers in one year, and has 3.2 million visitors to its websites each year, does not qualify for a famous mark, what would qualify for a famous mark? Let's go back to the sleep craft factors for just a moment. Yes, your honor. So what, is this a strong mark? Your honor, I believe it's a strong mark. However, it is- What do you, what do you, how do you arrive at that statement? I arrive at the statement the following way, your honor. First of all, E, it does not describe anything. It is an invented word. But as the court has said on numerous occasions, this court stopped by just saying it's descriptive and it's not distinct. It didn't go on, you will not see anything in there about our sales, our advertising. As this court has said many times, the first step only in determining strength is to look at how you would categorize a mark on the spectrum of descriptive, suggestive. I believe this mark is strong because even if your honors find it suggests entertainment, it certainly isn't descriptive of entertainment. We could not have gotten a register- You know, somebody who looks at that, what, what does it, what does it- Suggest. Describe or suggest? What it would suggest to me, our, our, our trademark, our network, our channel, our website, your honor, our DVDs, our programming. That's- But that's because you know all of it. But I mean, to a consumer, I look, I look at E and all it is is a letter. Well, your honor, you're- Understand it's just one letter and followed by another character. Let me respond to that by saying this, your honor, in the GOTO case, in the Disney case, Disney claimed, well, there are a lot of people using go on the internet. There are a lot of people that use go and there's a lot of people that use green. And what the court said is you're not, there are a lot of people that use go and a lot of people that use green. And what the court said is- I don't understand the second word, green? Green, because green was part of the logo in the Disney case. Thank you. And what the court said is you've got to look at the whole mark. Your honor, they are not just using E, they are using E, one, entertainment. They are using E, one, that looks like an exclamation mark. They are using our entire mark. We are not trying to have a monopoly on all uses of E. If they have another way of using E, we're not going after ESPN. We're not going against A&E. We are going against this E, and this E has adopted virtually our entire mark. And once your trademark is outside of your control, your honor, you cannot control its reputation. Once there's a likelihood of dilution, this distinctive significance of this mark disappears. So if they just used E without the one, you'd like that, huh? Your honor, if they use small E and they spelled out one, I would love it. If they just use E, the way we're pronounced, people don't say, are you going to go watch that program on E exclamation mark? They say, are you going to go watch that program on E? We are, for television programming, we have a production company in L.A., they have a production company in L.A. We sell DVDs with programming, they sell DVDs with programming. They say they sell DVDs with programming to retailers, to wholesalers, and everything else. And who goes to Best Buy and Walmart and buys those? Consumers go out there and buy those. And how do our advertising dollars, captured by these companies, it's by the popularity of shows, and that's why they put their name at the front and the back of when shows are introduced, your honor. If your honors have further questions, otherwise, I'd like to reserve a few. Let me have one other question for you. Do you think the district court made any serious errors of law? I think that there were several serious errors of law, your honor. Which, first, by comparing, not comparing the similarities, but only looking at the differences. I think that was a very serious error of law. Second, your honor asked about actual confusion in the last case. The reality is that the Brookfield case, decided by this court in 1999, and by his honor in the Academy Award case, actual confusion is not necessary to prove likelihood of confusion. That's, it helps, but sometimes that confusion is not manifested. And I respectfully say to your honors that we wrote a cease and desist letter on February 17th. On January 22nd, they announced they were going to implement the name change within the next 60 to 90 days. We are not, we should not have the responsibility of waiting until our mark is irreparably harmed to go after and stop them. We moved quickly in order to save them hardship and in order to spare us from the hardship and irreparable harm. Thank you, your honors. So where are you now? I'm sorry, your honor. Where are you now? Your honor, we've recently submitted a scheduling order to Judge Real, and we, counsel and I have agreed that a trial will... Judge Real? I'm sorry, your honor. Like, you know, motion picture reels. We have submitted the scheduling order and the parties have exchanged disclosures. And that's where we are right now, your honor. All right. Good afternoon. I'm Neil Saltman, a mayor of Brown, on behalf of the defendant and appellee. To answer a question before it comes up, there was no survey here of any sort. Right, but the findings of fact you proposed to the judge said failure to have survey allows the court to draw a negative inference. And it's followed by citations to district court decisions. Now, why somebody of your caliber would submit a proposed finding like that to the district court judge is beyond me. We cited your case. No, that case is a district court case. It's of no precedential value. Well, there's also a citation to a court of appeals case, a different circuit, third circuit. That's of no precedential value in the Ninth Circuit. But it's a fact finding that he's making a statement. You cited it as authority. For the ability to draw an inference. You make a statement and then you cite it, you back it up with authority from the district court. How ridiculous can you be? We were in the district court. I don't think it's... I don't think it reviewed by us. Of course. But there wasn't a Ninth Circuit case contrary to that. And so there was no Ninth Circuit authority. But you make a very bold statement. You draw a negative inference. Actually, what we said is one can draw a negative inference from the lack of a survey. Judge Real didn't say that he did draw. He mentioned the fact that there was no survey. You gave him a set of findings of fact and conclusions of law that he signed blankets. He signed them. He didn't make a single change. You know, I think they were very good findings. I think they were fair findings. Well, what they tell me is that you submitted these findings and he just put his John Henry on them and really didn't look at them carefully. Because any careful judge would have X'd that out. I obviously don't know what's in Judge Real's mind in chambers. I submitted a set of findings that cited the evidence fairly, cited evidence on both sides. What Judge Real and his clerks do after that, obviously, there's no way for me to know. Submitting findings at the request of the judge is provided for by the local rules that has been so provided for decades. But let me be clear. You know what the problem with doing that is? Is that lawyers push it too far. And they don't need to. You prevailed before him. And you could have drafted proposed findings and conclusions of law that meshed with Ninth Circuit law right down the line. I don't think there's any disagreement between that statement and existing Ninth Circuit law. We would have cited Ninth Circuit cases if there was a Ninth Circuit case on point. Except the problem is you cite stuff and look and from what we then look at, we look at what Judge Real did and it looks like he drew a negative inference because they didn't bring in evidence of confusion. The number of ways in which this order should be affirmed has nothing, really, almost nothing to do with that one issue, even if that were incorrect. Let me give you an example. The question of whether there should be a reversal of the denial of an injunction obviously depends on what the injunction says. This injunction said, or the proposed injunction, using in any manner the letter E as a dominant or lead component in any trademark or service mark or part of any entertainment-related products or services. So this was a request exactly similar to the request that the Ninth Circuit refused to accept in the One Industries case a few months ago, a request that says, we get the E and we get it in the entertainment business no matter how you use it. That's what the injunction request was. So the question for this Court was an abusive discretion to not give them a monopoly over the letter E and the word entertainment in the entertainment business. Okay. There are a number... Doesn't that get to the scope of the injunction? Well, there is no injunction here, but he obviously had the right to not grant an injunction of that sort. You can go to the district court and you can ask for the moon. That doesn't mean you're going to get it. But they asked for it and he denied it. And they didn't come in and say, when we argued... Okay, but they had to establish that there was a likelihood of success on their claim. Right. That there was infringement. Yes. Right? Yes. And then if they did, then they might be entitled to injunctive relief, depending on what they want. But that's what they were trying to prove. They were trying to prove that they were the only ones who should have... They were trying to prove that there was infringement to start with. Well, that was one thing they were trying to prove. Well, without any infringement, they're not going to get anything. If they don't prove that, they're nowhere. Okay. And I think there are two issues we should talk about there. One is the question of what is the test for an injunction with regard to presumed irreparable injury. That's an unresolved issue in this circuit. Well, our most recent case seems to suggest that it's still alive to some extent. I think if we're talking about Marlin... Marlin. If we're talking about Marlin, I don't think that's a fair conclusion, because it's not mentioned in Marlin. It's... Winter is mentioned, but Marlin doesn't mention the eBay issue. And it oddly quotes what the district court said, but the tense... Court of Appeals words, it says the district court did such and such. But be that as it may, perhaps they weren't... Why did your client come up with that e-mark? You knew the other... I don't know whether we knew that or not. Well, before you go ahead and advise the client, you can... It used to be $20. You can find out who else in the world is using a mark. Isn't that right? There are ways to do that, yes. Way to do it. There are ways to do it. Not expensive, and you can get the information. Was that done here? The record doesn't reflect one way or the other. Well, did you do it? I was not counsel to them at the time. They are in Canada. They had Canadian counsel in conjunction with that. So I can't answer that question. Well, the record reflects that they were doing... They were negotiating something with... Later on. I thought before. No, no. Later on. Later? Later. I misread... In March. In March. In March. They filed in March, letter in February. There were negotiations in March and April. There were no negotiations beforehand. And those were post-litigation negotiations. I think the presumed irreparable injury issue is a significant issue, because I think what you have is... You don't get there until you have an infringement. Well, that's true. But if you... Even if you had an infringement, you couldn't get to an injunction. Why wasn't there an infringement here? There wasn't an infringement because there are only three marks involved and not the ones they say that are involved. Let me tell you the three marks. One is the logo. Can I have a picture of them? Yes. It's in the brief. These are the marks. It's in the record as well as in the brief. Ours is the one on the bottom, the blue square one. Theirs are the ones there. Our blue E1 entertainment mark is a mark that is used in the United States. If this looks like these three, we must have different sets of eyes. And the district court didn't think they did. And I don't think it's implausible or clearly erroneous to say that this E1 mark looks a whole lot different than these marks. Certainly, if you look at what the court looked at, this court looked at in one industries, were much closer, just O's, stylized O's. They were much closer than these are. That's number one. Number two, the other two marks. Well, if you just take a quick glance at them, which is what most people do, you've got yours, you've got the E1, and then some flash of light that looks like a 1, and then the word entertainment. And they have E and a block underneath it, entertainment television. So if you look at them as they come in the marketplace. One is E exclamation point entertainment. The other is E1 entertainment. And one is E entertainment dot com. And the other is E1 entertainment dot com. I think we need to distinguish between what's being used in commerce and what's not being used in commerce. What did you say? I think we need to distinguish between what's being used in commerce and what's not being used in commerce. The E1 entertainment logo here is being used in commerce. It's on, for example, these which are in the record. Okay? These are DVDs sold by my client. The logo's on the back. It's in the record here. These are the only products in the United States which have the logos on them. This category of product. Yeah. You want to pass those up? Sure. You got a DVD player, too? No. Thank you. You have to hand them to the young lady there first. Yeah. Protocol. No, no. That's what I've got. That's fine. All right. Okay. Well, waive the protocol. All right. The second, there are two other marks that are used. And they're the only marks that are used. And this is critically important. It gets to the issue talked about in the last case. If you see on the bottom there, and it's hard to see because the print's small, you also see the words, Manufactured and Distributed by E1 Entertainment, GPLLC. And... Where is that? Very bottom. Right here. Both of them? Yeah. Then you can see, Manufactured and Distributed by E1 Entertainment, USLP, 22 Harbor Park Drive, Port Washington. Yes. Those two marks, E1 Entertainment, GPLLC, and E1 Entertainment, USLP, are the only marks ever used in the United States on this record other than the logo. And why do I emphasize that? Because when you were told that there are these other marks, E1 Entertainment, there isn't any. When you were told there was a mark E1, there isn't any. The only marks sold in US commerce are the logo, which is on there, and those two names, period. Now, in the go-to case, the court said, and in the entrepreneur case, this court said, you need to use, if it's a corporate name being used, you need to use the corporate name. Are these yours? They are yours now. No, I don't accept gifts. You can send a check. I mean, these are in the record. I should say, these were in the record before the district court. Yeah, but these are not yours. Not mine personally. No, I mean, are they your clients? Yes. Your clients? Yes. They're my client's product. They have my client's product mark and corporate name on it. E1 Entertainment, okay. No, actually, E1 Entertainment, US LLC, and E1 Entertainment, US GP, LLC. The reason for that is... I can't see that. You're not the only one who can. But I think the important, the relevant issue here is all of the discussion, the vague discussion that the plaintiff goes through about your E1 and your E1 television, we're not that. That's not what we use in the United States. These are the marks we have used in the United States. So the question is, if you look at the go-to case, you look at the entrepreneur case, it says if you use the corporate name, the anti-dissection rule, you're not allowed to take the mark apart. Say, we'll take out the E, or we'll take out the entertainment, but you can't look at the other things. That doesn't apply here. So now the question is, one, is our logo similar to theirs so that it was clearer for the district court to say that there's a difference between those two? And are our corporate names so sufficiently different that it was a clearer to say that E1 Entertainment, US... Well, why did you pick this then? I wasn't there, Your Honor. I can't tell you. Their name before was Entertainment One. This, I think, was a natural maturation of that over a period of years. But I think there's no reason why you can't pick a name or a logo which is materially different. And I don't think anybody, I certainly don't think it is clearer to say that these four logos are not the same or that they would create confusion. The words are not the same in any of them. But as R says, E1 Entertainment... That's true. But if I'm a consumer, I'd pick it up. I mean, I'd pick up those DVDs, let's say. I mean, I could look at that and think, oh, that's E Entertainment. You could. But district court said it didn't, given the record that was in front of it. And that's not clearly erroneous, because if you could make the decision one way or the other way, then it's not clearly erroneous. But there are a number of other issues that I think get beyond that. It's a weak mark. It's a weak mark because... Their mark is weak because it's descriptive. It's descriptive. Descriptive. What does it describe? It describes the entertainment. Well, what kind of entertainment? Any kind of entertainment. Doesn't that suggest that it's a suggestive mark? No, I think it suggests that it's... You have to think. You have to think about whatever... Well, it embodies everything. All forms of entertainment. So unless they're... No, that doesn't... Why isn't that suggestive then? I don't think it suggests anything other than entertainment. Let's put it this way, Judge Paius. I don't think it is clearly wrong to conclude that a mark that says E! Entertainment describes entertainment when the company is in the entertainment business. That's the issue we have. I don't think that's clearly wrong. I don't think that's implausible. Maybe you could quibble one way or the other, whether it's descriptive or suggestive. I don't think it really matters for the second reason, which is it's weak because it's in a very crowded field. There are 56 E! marks in the entertainment industry that are registered. They're in the record. The judge gave credit to those to find that it was a crowded field and therefore a weak mark. The combination of the descriptive nature of the name, there are hundreds of marks with E's. But if you just get to the television and film segment of the entertainment business, there are 56. And they're all in the record. There are 137 if you just go to the entertainment business, which have E marks, including something like EI for entertainment insiders. How close is EI to E! There's a little gap between where the dot is and whether it's filled in. That's a mark that's been out there for a while. ET, Entertainment Tonight, has been out there for decades. Entertainment Weekly, EW, has been out there for decades. There are dozens and dozens of marks in the entertainment industry, which not surprisingly begin with an E because it is the entertainment industry. And the result of that is that the finding that this was a weak mark is clearly not erroneous and I think more than a little bit plausible. Okay, you've got all your time up. Thank you, Your Honors. Just a few very quick points. First, Judge Pius is right. The parties were involved in negotiations in 2007. That is part of the record. E acquired Blueprint. Blueprint is a television production company in Chicago. The parties did not consummate the deal because they were fighting over who had distribution rights, which shows the similarity of the businesses. Your Honor, we ask you to take judicial notice of what they filed on July 23rd after our initial brief as an intent to use the application in the U.S. Patent and Trademark Office. This does not look like any of the pictures you were just showing. This shows their good faith intent to use this mark. It looks almost identical to ours. And I'd respectfully submit that just as the DreamWorks case said it was important how things look in printed publications, such as Variety, such as Hollywood Reporter, such as L.A. Times, you will see in the record that they used their mark in the Word format. I'd also like to just, you know, Judge Paz asked whether there were other grave errors committed by this judge. I think Your Honors have hit on several of them, but another one is finding that all of the consumers are sophisticated. You've got to look at the general public, and as Honor Judge Perkerson said in the Academy Award case, you've got to look at post-sale confusion as well. You're not just looking at the direct purchaser. And I guess the final thing, Your Honor, is that if you look at their press release on January 22nd, it's part of the record, I believe, at 143 through 148. And if you look at their website, this company has said that they are rapidly growing. These are converging markets. That doesn't really get you too far. Pardon me? That doesn't get you too far. I mean, I don't see that, you know, that's all that, that that is all that relevant, the fact that they want to grow. The fact that they want to grow with a confusing similar remark, you know, Your Honor, one of the factors in the sleep. We're looking at the record before the district court, when the district court made his decision to deny this preliminary injunction. So what was before the district court? Well, before the district court, before the district judge was the sleep craft factor likelihood of expansion. Part of the record is their press release, where they are intending to become the largest entertainment content company in the world. That's in the record, Your Honor. They also have in the record as part of their website that by 2010, they're going to have 75 worldwide licenses, which include consumer goods, consumer goods of the type that we sell. Likelihood of expansion is a factor you must look at in a preliminary injunction. What about counsel's argument about the 130, I may misquote him, 137 marks in the entertainment field? I'll say EEE. First of all, Your Honor, you will not find one single mark that is E entertainment, not one. With respect to this. When we say ET. That is always used with entertainment tonight underneath it. In this case, you've got E1 and underneath it is E entertainment. ET with entertainment, ET with entertainment tonight gives a totally different commercial impression. I'd also say that the record that is before you with this EI, it's always used with entertainment insider with a small E. If you're, you know, when Your Honors look at that, you're not going to think of E entertainment. Let's pull that up again. Yes, Your Honor. This was their specimen. This was the specimen of use submitted on July 23rd with the intent to use application filed in the U.S. Patent and Trademark Office. And if Your Honors would take judicial notice of the U.S. Patent and Trademark Office, you will find that the Trademark Office has initially rejected that as confusing. Now, they have an opportunity to fight that, but the Trademark Office found that that was confusing. There you go. All right. We have to go over there because we're reporting everything for posterity. I know from other cases that the Court frequently rejects requests for judicial notice for matters that were not in front of the District Court. Whatever that document is, I've never seen it. I know that the District Court never saw it. And it seems to me that it's quite inappropriate to review an injunction based on a record that was before the District Court and then start talking outside the record of documents which may or may not be accurate and certainly were not there. There's going to be a permanent injunction here. There's going to be a damage hearing, and we can deal with that at that point. You know, it's like findings of fact and conclusions of law. Thank you, Your Honor. Your Honor, if I may just make one last comment. The letter requesting Your Honors to take judicial notice was copied to Consul. We set forth the law supporting the position and Consul's firm filed the application for E-1 Entertainment as you see it. So... All right. Thank you. I would say, Your Honor, we don't think we've ever seen a letter requesting judicial notice that would have responded. It was a Rule 28 letter. We responded to that. All right. Well, it's all right. This has been great entertainment. And... With a capital E. With a capital E. Yeah, capital E. And, you know, why don't you... Why don't we promote a little fisticuffs here? That'd be nice. We can... It's all right. It's energetic and keeps us awake. All right. Thank you. Thank you. All right. Thank you, Counsel. Thank you. It's been a pleasure. And sorry we have rain in L.A. for you.
judges: Mahan, Pregerson, Paez